1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   SAMMY SULUFAIGA PEA,                    No. C 08-02808 JW (PR)
12            Petitioner,                    **ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS;**
13        v.                                 **DENYING CERTIFICATE OF
                                             APPEALABILITY**
14
     JOHN F. SALAZAR, Warden,
15
              Respondent.
16
                                          /
17

18                        **I. INTRODUCTION**

19          This matter is now before the Court for consideration of Sammy Sulufaiga Pea's

20   ("Petitioner") <u>pro se</u> Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[1] concerning

21   his 2006 conviction in Santa Clara County Superior Court.  For the reasons set forth below,

22   the Petition is DENIED as to all claims.  In addition, no certificate of appealability will be

23   issued.

24                        **II. BACKGROUND**

25   **A.     Facts**

26          In an unpublished opinion addressing Petitioner's claims on direct appeal, the

27   _____

28          [1] Hereafter, "Petition," Docket Item No. 1.

Order Denying Petition
C:\Users\noblew\AppData\Local\Temp\fz3temp-1\Pea2808_denyHC.wpd

**United States District Court**
For the Northern District of California

1    California Court of Appeal set forth the following summary of the facts:

2        ***The Prosecution's Case***

3        The victim was born and raised in Samoa, where she lived with her mother,
         stepfather, and seven siblings. She thought that her stepfather was her
4        biological father until defendant wrote her a letter when she was in high school,
         telling her that he was her father and expressing an interest in having contact
5        with her. She asked her mother about defendant's letter. Her mother said that
         defendant had been her boyfriend, that defendant had left Samoa for the United
6        States knowing that she was pregnant with the victim, and that defendant is the
         victim's father. She apologized for not telling the victim everything before
7        then. The victim communicated with defendant through letters and phone calls.
         Her native language is Samoan, but she learned English in high school.

8
         Defendant invited the victim to come to the United States, and offered to
9        sponsor her. Her mother was upset about her leaving, but defendant paid for
         her plane ticket and led the victim and her mother to understand that the victim
10       would be gone for only three months. The victim arrived in California in
         March 1995, a few weeks before her 18th birthday. Defendant took the
11       victim's immigration papers and kept them in a locked file cabinet in his office.
         He gave her her green card, and explained what a green card is. After three
12       months, the victim told defendant that she wanted to go home, but he told her
         that this was where she was supposed to be.

13
         The victim lived with defendant and his wife and family. The first year she
14       was here, the victim treated defendant like a daughter would treat her father;
         she respected and obeyed him. She started working on a daily basis for
15       defendant at his office shortly after her 18th birthday. After she started taking
         classes in September 1995 to get her high school diploma, she worked in
16       defendant's office after school. Defendant did not pay the victim for her work,
         and she relied on defendant and his family for her necessities. She wrote to her
17       mother many times, but she never received any letters from her mother or from
         anybody else.

18
         One day before her graduation ceremony in June or July 1996, when she was
19       19, the victim was in defendant's office when defendant got up and locked all
         the doors. He then pushed the victim up against the wall and started kissing
20       her. He also rubbed her breasts and vagina over her clothes. The victim tried
         to push defendant away and asked him what he was doing; she was afraid and
21       confused. Defendant said that he loved her. The victim continued to struggle
         and defendant finally stopped. The victim returned to her work area and did
22       not call the police or tell anybody in defendant's family about the incident.

23       A few days later, defendant told his wife that he was going to teach the victim
         how to drive. After her driving lesson, some time between 9:00 and 10:00 p.m.
24       that night, defendant drove the victim to a store parking lot and parked the car.
         The area was dark, and the victim asked defendant what they were doing there.
25       Defendant did not answer her. He took off his and the victim's seat belts, and
         then climbed over the center console and got on top of the victim, facing her.
26       He unzipped and pulled down his and the victim's pants and put his penis
         inside her vagina. The victim said, "please stop," and tried to push defendant
27       away, but she was unable to do so. The victim was angry, afraid, and
         embarrassed. After defendant ejaculated, he climbed back into the driver's
28       seat, threw napkins at the victim, and told her to wipe herself and to put her

clothes on.  The victim asked defendant what would happen if she told his wife about the incident, but defendant did not respond and drove them home.  The victim did not tell defendant's wife what happened because the two of them were not close.

Defendant subsequently had intercourse with the victim three or four times each week.  Sometimes it occurred at his house or in his car while defendant was giving the victim driving lessons, but most of the time it occurred at his office.  The first four or five times, the victim struggled with defendant and told him that she did not want to do it.  When defendant continued his sexual assaults, the victim stopped struggling and let him do whatever he wanted to do.  She was embarrassed, afraid, and confused.  Defendant told the victim many times that if she ever told anybody about their sexual contacts, he would "hang" her.  He also said that nobody would believe her.

In early 1997, sometime after the victim actually received her high school diploma in January, the victim got a job at Trend Plastics.  At the end of 1997, the victim quit her job and flew to Oregon to live with defendant's brother's family.   She did not tell the family about her problems with defendant.  She returned to California in May 1998, when defendant told his brother that defendant needed the victim to babysit while his wife worked.  Defendant's brother sent the victim back to defendant.  Defendant immediately began having sexual intercourse with the victim again.   The sexual assaults would occur at defendant's house during weekdays when the victim was babysitting, or in defendant's office on the weekends.

One afternoon, the victim became upset at defendant's family and defendant beat her, causing her to have black eyes and a broken nose.  Shortly thereafter, the victim found out that she was pregnant.  She was afraid and embarrassed.  Defendant wanted her to get an abortion, so she flew to Southern California and stayed with defendant's cousin, Yee-Hung Tonumaipea, and his wife.  She told them that she had a problem with defendant, but she did not tell them that defendant had been sexually assaulting her or that she was pregnant.  She stayed with Tonumaipea for only a few weeks because defendant called and threatened to kill her if she did not have an abortion.  Defendant also called Tonumaipea often, encouraging him to send the victim back.  The victim returned to the Bay Area and stayed with a friend she had met at Trend Plastics.

Defendant continued to call the victim and tell her to get an abortion.  He took her to apply for medical insurance, and then, in the summer of 1998, to get the abortion.  She told the abortion clinic that the father of her child was a boyfriend from Samoa who went back home.  After the procedure defendant took the victim back to her friend's house, where she stayed; she did not go back to live with defendant.  She continued to work at defendant's office on a daily basis, however, even though defendant was not paying her and he continued to have sexual intercourse with her two or three times each month.  When the victim got a job at Unilab in October or November 1998, she continued to work at defendant's office on the weekends.  She was still afraid of defendant and thought that if she did not do what he wanted her to do, he would carry out his threat to kill her.

The victim started dating David Hatch in May 2000.  In early 2001, the victim told Hatch that defendant had sexually abused her beginning around the time of her high school graduation, and she showed him a "romantic" Valentine's Day card that defendant had given her.  She said that she had moved out of

3

defendant's home, but she did not say whether the abuse had stopped or was still occurring. Hatch encouraged the victim to talk to her church bishop and to the police. The victim told her church bishop that defendant had sexually assaulted her, and the bishop encouraged her to talk to the police and to family members. The victim called Tonumaipea and told him that defendant had sexually assaulted her, but Tonumaipea did not encourage her to do anything about it and he did not contact the police. The victim did not talk to the police herself because she was still afraid of defendant. The victim stopped dating Hatch in August 2002.

The victim started dating Robert S., who is now her husband, in early November 2002, and they became engaged in July 2003. After she had a miscarriage in September 2003, the victim told Robert for the first time that defendant had sexually assaulted her. Robert contacted the police, and the police contacted the victim in October 2003. The victim told both Robert and the first officer she talked to that the sexual assaults began before her graduation ceremony and ended after her abortion. Defendant did not really stop assaulting her until May 2003, which was when she was able to retrieve her immigration papers from defendant's then unlocked office file cabinet and she stopped going there. In January 2004, after the victim learned that defendant had been arrested, she told both Robert and the police the date the assaults really stopped. When the victim went to Samoa to get married in July 2004, she also told her mother all about the extent of defendant's sexual assaults. Robert has filed a lawsuit against defendant, seeking to recover the medical expenses associated with defendant's abuse of the victim.

Santa Clara Police Officer Dan Moreno recorded a telephone call the victim made to defendant in November 2003. During the call, defendant said that he knows that "having sex" with the victim "was wrong," and that her having the abortion "was the right thing to do" because "we're not supposed to . . . have a child like that."

Officer Moreno interviewed defendant in December 2003. During the interview, defendant said that he knew when he left Samoa that his girlfriend was pregnant, that the victim is his daughter, and that he brought the victim here from Samoa in 1995 before she was 18. He stated that he and the victim had "a sexual relationship" for "approximately three years," starting "around '97 or '98." The first sexual contact occurred when they were in his office. The victim asked him to check her breasts for breast cancer. He did, they started kissing, and she asked him to make love to her. He refused to do so at that time. Later that night she asked him again while they were in his car after he picked her up from school. He drove to the parking lot behind a store, and they made love in the car. He and the victim continued to have sex "two or three times a week" "for almost three years," "until she met uh, a guy named David." She got pregnant "probably '98 or '99," and he took her to get an abortion. Defendant also stated that he never forced the victim to have sex with him, that it was a consensual relationship, that she had recently called him and accused him of raping her, and that she is "a pathetic liar."

Defendant later gave Officer Moreno a copy of a letter a former boyfriend in Samoa sent to the victim in 1999 that defendant had intercepted. Defendant claimed the letter would show that the victim was "fabricating all these things."

*United States District Court*
*For the Northern District of California*

### The Defense Case

Fred Mulipola has a leadership position in defendant's church and knows defendant and the victim socially. Defendant always refers to the victim as his daughter. Once, Mulipola's wife received a letter that included false accusations about her. Mulipola took the letter to a church official. At first, the victim denied that she was involved in the writing of the letter, but she later admitted her involvement. In Mulipola's opinion, the victim is inconsistent in telling the truth and is dishonest; he would not trust her.

Rosita Tulua knows defendant and is the victim's good friend. In Tulua's opinion, the victim is honest sometimes, and is not sometimes. The victim has a reputation in the Samoan community for not being a very truthful person.

### The Rebuttal

Telesia Suani has known the victim since they were children in Samoa. He renewed their friendship after he met her at a church function in 2002. In Suani's opinion, the victim is a truthful person and a nice friend.

Lionel Riley met the victim when they worked together at Trend Plastics, and has socialized with her since that time. In Riley's opinion, the victim has always been a very truthful individual.

People v. Pea, No. H030507, California Court of Appeal, Sixth Appellate District (Aug. 30, 2007) (Answer to Petition, Ex. 5)[2] at 2-9.

**B.   Case History**

On May 25, 2006, a Santa Clara County jury convicted Petitioner of three counts of incest, and hung on two counts of forcible rape. (Ex. 1 (Clerk's Transcript) at 284-86.)

On July 20, 2006, pursuant to a stipulated agreement with the prosecutor, Petitioner waived his right to a jury trial on the rape charges. At the court trial, he was convicted of one count and the remaining count was dismissed. (Ex. 1 at 298.) On August 2, 2006, the trial court sentenced him to three years in state prison. (Ex. 1 at 334-337.)[3]

On August 30, 2007, the California Court of Appeal affirmed the judgment of conviction. (Ex. 5.) On November 28, 2007, the California Supreme Court denied Petitioner's petition for review, without comment.  (Ex. 7.)

On October 8, 2008, Petitioner filed the present Petition. Thereafter, Respondent's

---

[2] Hereafter, "Answer," Docket Item No. 15. All referenced exhibits are those lodged by Respondent in support of the Answer, unless otherwise noted.

[3] Petitioner currently is on parole.

5

1  motion to dismiss the Petition as unexhausted was granted, the Petition was stayed, and

2  Petitioner returned to state court to exhaust state remedies as to all claims.

3       On September 11, 2009, Petitioner filed a habeas corpus petition in the California

4  Supreme Court, which was summarily denied on October 28, 2009.  (Exs. 8 & 9.)

5       On December 21, 2009, Judge Walker lifted the stay and issued an Order to Show

6  Cause.  Respondent filed an Answer to the Petition.  Petitioner was provided the opportunity

7  to file a Traverse, but did not do so.

8        On March 2, 2011, the case was reassigned to the undersigned.

9  ### III. STANDARDS

10       This Court may entertain a petition for a writ of habeas corpus "in behalf of a person

11  in custody pursuant to the judgment of a State court only on the ground that he is in custody

12  in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a);

13  Rose v. Hodges, 423 U.S. 19, 21 (1975).

14       A district court may not grant a petition challenging a state conviction or sentence on

15  the basis of a claim that was reviewed on the merits in state court unless the state court's

16  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

17  unreasonable application of, clearly established Federal law, as determined by the Supreme

18  Court of the United States; or (2) resulted in a decision that was based on an unreasonable

19  determination of the facts in light of the evidence presented in the State court proceeding."

20  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions

21  of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong

22  applies to decisions based on factual determinations.  Miller-El v. Cockrell, 537 U.S. 322,

23  340 (2003).

24       A state court decision is "contrary to" clearly established Supreme Court precedent if

25  it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases,"

26  or if it "confronts a set of facts that are materially indistinguishable from a decision of [the

27  Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams,

28  529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.

Where constitutional error is found, habeas relief is warranted only if the error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (citation omitted).

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000). Here, the California Court of Appeal was the highest court to address, in a reasoned opinion, Petitioner's claims of insufficient evidence to support the incest convictions and the wrongful exclusion of evidence. Thus, it is that opinion which the Court reviews when ruling on those claims.

If there is no reasoned state court decision on the petitioner's claims, the federal court must conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). In the present case, there is no reasoned opinion from any California court addressing Petitioner's claims of insufficient evidence to support the rape conviction, the violation of his Miranda rights, and ineffective assistance of counsel. Consequently, the Court will conduct an independent review of the record to determine whether the state court's denial of these claims was reasonable.

**IV. DISCUSSION**

Petitioner raises the following five claims for habeas corpus relief:  1) the wrongful admission of evidence in violation of his <u>Miranda</u> rights; 2) the wrongful exclusion of impeachment evidence; 3) insufficiency of the evidence to support the incest convictions; 4) insufficiency of the evidence to support the rape conviction; and 5) ineffective assistance of trial and appellate counsel.

**A.      Violation of Miranda Rights**

Petitioner contends he was denied a fair trial because he does not remember being informed of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), before participating in a tape-recorded police interview that was played for the jury during trial.  (Pet. at 7, Ground One-B.)  Petitioner did not raise this claim on direct appeal and it has not been addressed by any state court in a reasoned decision.  Consequently, this Court has conducted an independent review of the record to determine whether the California Supreme Court's summary denial of this claim on state habeas corpus was an objectively unreasonable application of clearly established federal law.  <u>Plascencia</u>, 467 F.3d at 1198.

In November 2003, Sgt. Dan Moreno of the Santa Clara Police Department met with the victim, Fiona Doe, to follow up on a rape report he had received from a detective at the Campbell Police Department.  (Ex. 2 (Reporter's Transcript) at 313:3.)  The case was referred to Moreno because most of the acts occurred in Santa Clara.  (Ex. 2 at 311:5-8.)  During the meeting, Fiona, in the presence of Moreno, participated in a recorded pretext phone call to Petitioner, in which she confronted him with her allegations of incest and rape. (Ex. 2 at 314:22-315:10.)

Approximately three weeks later, on December 12, 2003, Moreno called Petitioner and asked him to come in for an interview; Petitioner came in the next day and the interview was tape-recorded.  (Ex. 2 at 316:18-318:2.)  At trial, the prosecutor submitted the tape-recording as evidence and it was played for the jury.  (Ex. 2 at 318:3.)

The interview began with the following statement by Moreno to Petitioner:

Um, this is an investigation for sexual assault.  Your name came up, so I called

1  you in for an interview.  I just want you to know you're not under arrest, okay.
2  You're here on your own free will to answer my questions.  You can leave at
   any time.  You don't have to answer questions for [sic] you don't want to.  Do
3  you understand?

4  (Ex. 1 at 220:1-9.)

5      Petitioner's response to the question was inaudible, but Moreno then said "Okay," and

6  the interview commenced.  (Ex. 1 at 220:10-11.)

7      During the interview, Petitioner admitted that he had an incestuous sexual relationship

8  with Fiona for approximately three years, starting in 1997 or 1998 (Ex. 1 at 233:4-18), and

9  that he knew it was "wrong" to do so (id. at 243:6-8.)  He maintained, however, that the

10 relationship was consensual.  (Ex. 1 at 245:14-19.)

11     After the interview was played for the jury, Petitioner's counsel, on cross-

12 examination, asked Moreno the following questions about Petitioner's participation in the

13 interview:

14     Q:   . . . December 12 of '03 is when you had your conversation with
            Sam Pea; correct?
15
16     A:   Correct.

17     Q:   And you called him up and said that there was something that
            you wanted to talk to him about, police context, sexual assault,
18          and for him to contact you about coming in?

19     A:   Yes.

20     Q:   He wasn't arrested; correct?

21     A:   He was not.

22     Q:   And when you called him on the phone to ask him to come in,
            you didn't say, "You're under arrest," or, "We have an arrest
23          warrant," or anything like that?
24
25     A:   I did not.

26     Q:   You said he could come in voluntarily?

27     A:   And he did come in voluntarily.

28     Q:   All right.  Very shortly after you called him; right?

**United States District Court**
For the Northern District of California

A:    The next day.

Q:    Okay.  And this took place at the Santa Clara Police Department?

A:    Yes.

Q:    And you have special interview rooms; correct?

A:    Yes.

Q:    All right.  And as we've heard, it was recorded?

A:    Correct.

Q:    And generally – tell me if it's true in this particular case, but you don't tell them they're being recorded; correct?

A:    No.  It's obvious.  There's a camera in the corner.

Q:    But you don't say anything?

A:    No.

(Ex. 2 at 325:16-326:17.)

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  <u>Miranda</u> protections are triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994).  "[I]n custody" means "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam) (quotation omitted).

Neither <u>Miranda</u> nor its Supreme Court progeny set down any bright line rule or specific test for determining when someone is in custody.  Instead, those cases suggest that the totality of the circumstances of each case must be examined to determine whether there was custody.  <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 661-62 (2004).  The determination is based on an objective inquiry into 1) the circumstances surrounding the interrogation, and 2) whether a reasonable person would have felt at liberty to end the interrogation and leave,

given those circumstances.  <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).  Whether a suspect is "in custody," and therefore entitled to <u>Miranda</u> warnings is a mixed question of law and fact.  <u>See id.</u> at 107-110 & n.9.  Because the Supreme Court's test for determining custody is a general standard, the range of reasonable judgments by a state court on this issue is broad.  <u>Yarborough</u>, 541 U.S. at 663-64.

Here, the evidence shows that a reasonable person in Petitioner's situation would not have believed that he was in custody while he was at the police station being interviewed by Moreno.  Specifically, as discussed above, the uncontested evidence shows that Moreno asked Petitioner to come voluntarily to the police station to be interviewed as a witness and did not tell him that he was compelled to do so or that he was under arrest, and that Moreno expressly told Petitioner, before starting the interview, that Petitioner was not under arrest, he could leave at any time, and he could refuse to answer questions.  Further, during the interview, Moreno reassured Petitioner that he was "not on anyone's side" and that the purpose of the interview was to give Petitioner the chance to give his version of the facts. (Ex. 1 at 239:23-240:5.)

Based on this record, the Court concludes that Petitioner was not in custody during the interview and, therefore, no <u>Miranda</u> warning was required.  <u>See</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam) (finding suspect was not in custody for purposes of <u>Miranda</u> where, during interview at police station, police indicated their belief that defendant committed crime, but told him he was not under arrest).  Consequently, no constitutional violation occurred when the tape-recording of the interview was played to the jury.  Because the state court's rejection of this claim was not an contrary to or an unreasonable application of clearly established federal law, Petitioner is not entitled to habeas relief on this claim.

**B.**   **<u>Exclusion of Impeachment Evidence</u>**

Petitioner contends the trial court violated his right to due process by excluding evidence of the contents of a letter written to Fiona in 1999 by a former boyfriend in Samoa. The letter, written in Samoan, was intercepted by Petitioner; he gave it to Sgt. Moreno during the investigation of Fiona's allegations, to support his assertion that Fiona was sexually

United States District Court

For the Northern District of California

promiscuous.  When Moreno subsequently asked Fiona about the contents of the letter, she denied that it contained any sexually explicit language.

During pre-trial proceedings, the prosecutor moved to introduce evidence of the existence of the letter to show that Petitioner had been intercepting Fiona's mail, but to bar evidence of the contents of the letter.  (Ex. 1 at 182-83.)  Petitioner's counsel argued that the contents of the letter should be admitted because it was relevant to the matter of Fiona's credibility, a central issue in the case against Petitioner.  (Ex. 2 at 20:13-21:17.)  At the time the matter was argued to the trial court, there were at least four different translations of the letter from Samoan into English, and the prosecutor and Petitioner's counsel disagreed as to which translation most accurately reflected the letter's contents.  (Ex. 2 at 21:18-27; 23:7-24:1).  While Petitioner maintained the contents showed Fiona was sexually active, the prosecutor contended that the letter's "flowery" language was euphemistic, and that it's only relevance would be to show that Fiona had lied about her chastity, which is not a permissible topic for cross-examination of a rape victim under California Evidence Code section 782. (Ex. 2 at 22:1-27, 26:8-27:11.)

After taking the matter under submission and reviewing the translations provided by the parties, as well as a translation obtained from a translator on the court's list of Samoan interpreters, the trial court ruled on the prosecutor's motion to exclude the contents of the letter as follows:

> [I] had a chance to review the letter.  I've given you copies of it, and my position is that on this issue of whether Fiona Doe can be asked whether she lied to the police or at the prelim about the contents of the letter, which seems to suggest that she might have had a sexual relationship with the writer of the letter and that would have occurred prior to any sexual behavior with the defendant, I'm going to find that - that we're just not going to go into that area.
>
> No [Evidence Code section] 782 motion has ever been filed.  Ms. Doe's virginity is simply not relevant to the charges, and there's no right to examine witnesses on irrelevant matters.  There is no competent evidence that she lied in the first place.  The letter is hearsay.  The defendant can't testify to the truthfulness of the letter.
>
> There's at least three different translations about the letter, and I don't know anything about the Samoan language, but they certainly do not all say the same

thing.

It starts out to "Dear Wife," and I think there's no evidence that she was his wife, so I don't know what this means, but I just don't feel that it is competent relevant evidence.

Based on the opening statements, it appears that Ms. Doe gave different accounts of what took place and when. There was a lack of reporting. There are inconsistencies, therefore, in her testimony that seem to - that it appears will be brought out, and so those inconsistencies, obviously, go to her credibility, and so there appear to be a number of things that will discuss her credibility, and I believe that the probative value of any question about the letter is substantially outweighed by the probability that it will create a substantial danger of undue prejudice, confusing the jury and misleading the jury, and under [Evidence Code section] 352, I'm not going to allow it.

(Ex. 2 at 115:12-116:17.)

On appeal, Petitioner argued that the trial court abused its discretion by excluding the contents of the letter under California Evidence Code section 352, and that the error violated his constitutional rights to confrontation and due process. The California Court of Appeal upheld the trial court's ruling, holding as follows:

Trial courts have the discretion to exclude otherwise admissible evidence pursuant to Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; People v. Reeder (1978) 82 Cal.App.3d 543, 553.) "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.]" (People v. Hall (1986) 41 Cal.3d 826, 834; People v. Cudjo (1993) 6 Cal.4th 585, 611.) A ruling excluding evidence under Evidence Code section 352 will be overturned on appeal only if the trial court "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (People v. Jordan (1986) 42 Cal.3d 308, 316; People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125 (Rodrigues).) Therefore, the question before us is whether the trial court abused its discretion in determining that the probative value of the contents of the letter was substantially outweighed by the probability that its admission would "necessitate undue consumption of time or . . . create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Evidence Code section 782 protects rape victims from extensive questioning about their prior sexual conduct unless the defense is able to show in advance

United States District Court

For the Northern District of California

that the victim's prior sexual conduct is relevant to the issue of the victim's credibility.  (See People v. Casas (1986) 181 Cal.App.3d 889, 895.)  This court has already determined that some statements by the victim about the victim's own sexual conduct may qualify as evidence of the victim's prior sexual conduct.  In People v. Franklin (1994) 25 Cal.App.4th 328 at pages 335-336, this court concluded that a trial court erred in excluding evidence that the minor victim of continuous sexual abuse had falsely accused her own mother of licking her genitals.  We stated: "Just as a prior false accusation of rape is relevant on the issue of a rape victim's credibility [citation], a prior false accusation of sexual molestation is equally relevant on the issue of the molest victim's credibility."  (Id. at p. 335, fn. omitted.)  "[I]f the trier of fact found it true that [the victim] falsely stated that her mother sexually molested her, this statement would be relevant to the trier of fact's determination of her credibility on defendant's culpability."  (Id. at p. 336.)  However, in Franklin, we found the trial court's error in excluding the victim's statements to be harmless because the evidence was cumulative of other evidence bearing on the victim's credibility.  (Id. at p. 337, but see Franklin v. Henry (9th Cir. 1997) 122 F.3d 1270 [granting habeas relief].)

Franklin makes the point that sometimes what is most relevant about a victim's statement about his or her own sexual conduct is not whether the victim engaged in the activity, but whether the statement is truthful.  Yet, this case is readily distinguishable from Franklin.  In Franklin, the evidence of the victim's false accusation could have been presented without confusing the jury or consuming an inordinate amount of time, as it was undisputed that the victim's allegation was in fact false.  By contrast, in this case admission of the contents of the letter to the victim would have entailed a mini-trial on whether or not any statements in the letter about the victim's sexual conduct were true, which could confuse or mislead the jury.  The victim herself did not make the statements, and, as the trial court found, defendant could not testify as to the truthfulness of any of the statements.

Defendant sought to use the contents of the letter to impeach the victim's credibility.  Ample evidence was admitted for impeachment purposes: there was evidence that the sexual contacts were consensual, that the victim's husband has filed a civil lawsuit against defendant, and that the victim changed the ending date of the alleged sexual contacts to bring the case within the statute of limitations.  The excluded evidence was therefore both cumulative and confusing or misleading.  (Evid. Code, § 352.)  Accordingly, we cannot say that the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner" (Rodrigues, supra, 8 Cal.4th at p. 1124) when it refused to admit evidence of the contents of the letter.

(Ex. 5 at 18-19.)

Under California Evidence Code § 352, a trial court may exercise discretion to exclude evidence if the probative value of the evidence "is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create

United States District Court

For the Northern District of California

1  substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

2  Here, as the state appellate court explained, the trial court's exclusion of the contents of the

3  letter was reasonable and within its discretion.  In particular, the probative value of using the

4  letter's contents to impeach Fiona's credibility was substantially outweighed by the

5  prejudicial impact of holding a "mini-trial" on the veracity of the statements in the letter, and

6  the confusing and misleading effect it would have on the jury.  Further, the evidence was

7  cumulative of other ample evidence admitted for impeachment purposes.  Accordingly, the

8  exclusion of the letter's contents was not a violation of Evidence Code § 352 but, rather, was

9  consistent with the purpose of the evidentiary rule.

10         Moreover, even if there was a violation of state evidentiary law, such a violation is not

11  subject to federal habeas review unless the ruling violates federal law, either by infringing

12  upon a specific federal constitutional or statutory provision or by depriving the defendant of

13  the fundamentally fair trial guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41

14  (1984).  Exclusion of defense evidence can violate a defendant's constitutional right to

15  present a defense: "Whether rooted directly in the Due Process Clause of the Fourteenth

16  Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth

17  Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to

18  present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotation

19  and citation omitted).  However, while the Constitution prohibits the exclusion of defense

20  evidence under rules that serve no legitimate purpose or that are disproportionate to the ends

21  that they are asserted to promote, well-established rules of evidence permit trial judges to

22  exclude evidence if its probative value is outweighed by certain other factors such as unfair

23  prejudice, confusion of the issues, or potential to mislead the jury.  Id. at 326.  "The

24  Constitution permits judges to exclude evidence that is repetitive, only marginally relevant or

25  poses an undue risk of harassment, prejudice, or confusion of the issues." Id. at 326-27.

26         In the present case, the Court of Appeal's determination that the trial court properly

27  excluded the contents of the letter was reasonable.  Specifically, the record shows that even

28  though the  letter potentially had probative value on the issue of Fiona's credibility, it was

not the sole evidence on that issue, it did not constitute a major part of the defense, and it could not be relied upon and evaluated by the trier of fact without the holding of a mini-trial on its interpretation and veracity, which would confuse and mislead the jury.

Because the state court's determination was not contrary to or an unreasonable application of clearly established federal law, Petitioner is not entitled to habeas relief on this claim.

**C.**    **Insufficiency of the Evidence Claims**

Petitioner brings two claims based on insufficiency of the evidence: 1) the evidence was insufficient to support the incest convictions because there was no physical proof that Petitioner is Fiona's biological father, and 2) the evidence was insufficient to support the rape conviction because Fiona was not credible.

**1.**    **Incest Convictions**

Under California law, proof of incest as alleged in Petitioner's case required the prosecution to prove the following: 1) the defendant had sexual intercourse with another person; 2) when the defendant did so, he was at least fourteen years old; 3) when the defendant did so, the other person was at least fourteen years old; and 4) the defendant and the other person are related to each other as parent and child.  See Cal. Penal Code § 285; Jud. Council Cal. Crim. Jury Instr. (CALCRIM) No. 1108.  Whether a defendant is the victim's parent is a question of fact for the jury.  People v. Schafer, 12 Cal. App. 2d 5, 7 (1936).

Petitioner claims the evidence adduced at trial to prove that he is Fiona's father was insufficient because the prosecutor did not produce Fiona's birth certificate or present evidence of blood or genetic testing showing a blood relationship between Fiona and Petitioner.  The California Court of Appeal rejected this contention, finding as follows:

> '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (People v. Johnson (1980) 26 Cal.3d 557, 576, quoting Jackson v. Virginia (1979) 443 U.S. 307, 318-319.)  "An appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the

United States District Court

For the Northern District of California

evidence." (People v. Reilly (1970) 3 Cal.3d 421, 425; accord People v. Pensinger (1991) 52 Cal.3d 1210, 1237.)  "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.  [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' [Citations.]"  (People v. Morris (1988) 46 Cal.3d 1, 21, disapproved on other points in In re Sassounian (1995) 9 Cal.4th 535, 543-545, fns. 5, 6.)  A trier of fact may rely on inferences to support a conviction only if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true.  (People v. Raley (1992) 2 Cal.4th 870, 891.)

In order to prove the incest alleged in this case the prosecution had to prove that the defendant had sexual intercourse with the victim, and that defendant and the victim are related to each other as parent and child.  (See § 285; CALCRIM No. 1180.)  The prosecution presented evidence that defendant admitted having sexual intercourse with the victim.  It also presented evidence that defendant told the victim, Mulipola, and Officer Moreno that the victim is his daughter; that defendant knew that his girlfriend in Samoa, the victim's mother, was pregnant when he left Samoa; that the victim's mother told the victim that defendant is her father; that defendant offered to sponsor the victim, then got her a green card and gave it to her when he took her into his home as his daughter; and that defendant told the victim that having the abortion was the right thing to do because it was wrong for her to have his child.  This evidence is sufficient to support the finding of the jury that defendant is the victim's father.  (See, e.g., People v. Schafer (1936) 12 Cal.App.2d 5, 6-7 (Schafer); People v. Roberts (1947) 82 Cal.App.2d 654, 655-656 (Roberts); People v. Herman (1950) 97 Cal.App.2d 272, 275 (Herman).)

* * *

In the case before us, the uncontradicted evidence was that defendant believes the victim is his daughter, and that he presented her to his family and friends as his daughter.  He also told the victim and the police that the victim is his daughter.  The question of whether defendant is the victim's daughter "was one of fact and the evidence is sufficient to sustain the verdict of the jury." (Schafer, supra, 12 Cal.App.2d at p. 7.)

(Ex. 5 at 20-21.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief.  Jackson v.

17

United States District Court

For the Northern District of California

1   Virginia, 443 U.S. 307, 321, 324 (1979).  The federal court determines only whether, "after

2   viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

3   could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.

4   Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt

5   may the writ be granted. Id. at 324.  If confronted by a record that supports conflicting

6   inferences, a federal habeas court "must presume – even if it does not affirmatively appear on

7   the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and

8   must defer to that resolution." Id. at 326.

9        A federal sufficiency of the evidence inquiry is channeled by state law -- although

10  federal law requires sufficient evidence, it is state law that sets out the elements as to which

11  there must be sufficient evidence. Id. at 324 n.16; Sarausad v. Porter, 479 F.3d 671, 678 (9th

12  Cir. 2007), rev'd on other grounds by Waddington v. Sarausad, 555 U.S. 179 (2009).

13       Here, Petitioner does not object to the state court's factual findings, nor does he

14  present authority for the proposition that, under California law, a parent-child relationship,

15  for purposes of Penal Code § 285, cannot be established absent evidence of a birth certificate

16  or blood or genetic tests.  In light of the record presented, and presuming that the jury

17  resolved all conflicting inferences in favor of the prosecution, the Court concludes that any

18  rational trier of fact could find that Petitioner is Fiona's father for purposes of Penal Code

19  § 285.

20       Accordingly, because there was sufficient evidence to support the verdict of incest, the

21  state court's decision was not contrary to or an unreasonable application of clearly

22  established federal law, and Petitioner is not entitled to habeas relief on this claim.

23       **2.    Rape Conviction**

24       Petitioner claims he should not have been convicted of rape because Fiona's testimony

25  was not credible.  Specifically, he asserts that the evidence considered by the court during the

26  non-jury trial on the rape charges was insufficient to support the rape conviction because the

27  evidence shows that he and Fiona were in a consensual sexual relationship from Fall 1997

28  through December 1999.  Petitioner did not raise this claim on direct appeal and it has not

18

been addressed by any state court in a reasoned decision.  Consequently, this Court has conducted an independent review of the record to determine whether the California Supreme Court's summary denial of this claim on state habeas corpus was an objectively unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.

Under California law, proof of rape as alleged in Petitioner's case required the prosecution to prove the following: 1) the defendant had sexual intercourse with a woman; 2) he and the woman were not married to each other at the time of the intercourse; 3) the woman did not consent to the intercourse; and 4) the defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else.  See Cal. Penal Code § 261; CALCRIM 1000.

Pursuant to the parties' stipulation concerning the non-jury trial, the court considered the transcripts of the preliminary hearing and the jury trial to determine whether Petitioner was guilty of rape.  Additionally, the court admitted into evidence a letter offered by Petitioner, which Fiona had written to the Department of Labor seeking unpaid wages from Petitioner.  (Ex. 2 at 542:7-20.)[4]  After reviewing the record and hearing argument from Petitioner's counsel and the prosecutor, the court found as follows:

> In reviewing the evidence, the testimony of Fiona and the statements of the defendant, I did find that Fiona was a credible witness.
>
> There is no question that sexual intercourse occurred; that the victim and the defendant were not married to one another, and so the issues remain on whether there was consent and whether there was force, violence, duress, menace, or fear of immediate and unlawful bodily harm, and I find that there was no consent and that, in fact, there was force or fear of immediate and unlawful bodily harm.

(Ex. 2 at 547:21-548:2.)

Petitioner maintains that the court's findings were unreasonable because Fiona's testimony was not credible.  In particular, he claims the following evidence shows Fiona consented to sexual intercourse with him and did not fear that he would harm her: Fiona had

---

[4] The letter was not introduced at trial, and its contents are not part of the record herein.

United States District Court
For the Northern District of California

her own key to Petitioner's office and could go there at any time; she had another job and could stay with friends; she had a boyfriend in Samoa and met other boyfriends in high school; she reported she had been raped only after Petitioner refused to pay for her wedding; and, she initially told her boyfriend and police that she had non-consensual sex with Petitioner for three years, and then, after speaking with police, said it was for close to seven years.  (Pet. at 5, Ground One-A.)

Petitioner's argument is unpersuasive because there was ample evidence from which the trial court could find that the sexual intercourse between Petitioner and Fiona was non-consensual and that it was accomplished by threat of immediate and unlawful bodily harm. Specifically, as summarized by the California Court of Appeal, Fiona testified to the following: Petitioner told her many times that if she ever told anybody about their sexual contacts he would "hang" her; he once beat her, causing her to have black eyes and a broken nose, when she argued with his family; when she became pregnant, Petitioner called her and threatened to kill her if she did not have an abortion; even after she stopped living at Petitioner's house she was still afraid of him and thought that, if she did not do what he wanted her to do, he would carry out his threat to kill her; and, she told her husband and the police that the sexual encounters continued through 2003 – rather than through 2000, as she first told them – only after she learned Petitioner had been arrested.  (Ex. 5 at 4-6.)

In light of the record presented, and presuming that the trial court resolved all conflicting inferences in favor of the prosecution, the Court concludes that any rational trier of fact could find that Petitioner forced Fiona to have sexual intercourse without her consent and by threatening her with immediate and unlawful bodily harm, as is required to prove the crime of rape under Penal Code § 261.

Accordingly, because there was sufficient evidence to support the verdict of rape, the state court's decision was not contrary to or an unreasonable application of clearly established federal law, and Petitioner is not entitled to habeas relief on this claim.

**D.**   **Ineffective Assistance of Counsel**

Petitioner contends he received ineffective assistance of trial counsel for a number of

United States District Court

For the Northern District of California

reasons, and that the failure to raise trial counsel's deficiencies on appeal constituted ineffective assistance of appellate counsel.  (Pet. at 18, Ground Four-A & 20, Ground Four-B).)  These claims were not addressed by any state court in a reasoned decision.   Thus, this Court has conducted an independent review of the record to determine whether the California Supreme Court's summary denial of the claims on state habeas corpus was an objectively unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.

**1.      Ineffective Assistance of Trial Counsel**

A claim of ineffective assistance of trial counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, the petitioner first must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  Secondly, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong.  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).  Similarly, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as the result of the alleged deficiencies.  See Strickland, 466 U.S. at 697.

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 689).  The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential . . . and when the two apply in tandem, review is doubly so."  Id. at 788

(quotation and citations omitted).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."  <u>Id.</u>

### a.   Complaint and Letter Regarding Unpaid Wages

Petitioner claims counsel was ineffective for failing to present evidence of a complaint Fiona filed with the Department of Labor claiming unpaid wages from Petitioner, and a letter from the Department of Labor denying Fiona's claim.  The complaint has not been provided to the Court as part of the record in this case.  The letter from the Department of Labor is attached to Petitioner's state habeas corpus petition, however, which is part of the record herein.  (Ex. 8, Ex. #C.)  The letter states that Fiona's claim for unpaid wages is being denied because there is an exception to the requirement that workers be paid minimum wage for regular hours worked when the employee is a child of the employer.  <u>Id.</u>

Because the record shows that trial counsel did, in fact, enter the letter into evidence during the court trial on the rape charges (Ex. 2 at 542:7-18.), Petitioner's claim necessarily pertains only to counsel's conduct at the jury trial.  Petitioner, however, provides no explanation as to the relevance of the letter to his defense or why there is a reasonable probability that the outcome of the jury trial would have been different had it been admitted.  At best, the letter evidenced the strained relationship between Petitioner and Fiona.  But the jury was presented with a substantial amount of other evidence that showed the relationship was troubled, such as Fiona's testimony that she traveled to Los Angeles and Oregon to get away from Petitioner, evidence that Petitioner beat Fiona when she argued with his family, and statements by Petitioner in his tape-recorded interview with Sgt. Moreno evidence that Fiona humiliated him in front of her fiancé's family and she was angry that he refused to pay for her wedding.  Accordingly, the Court finds there is no reasonable probability that the outcome of the proceeding would have been different had the evidence concerning Fiona's claim for unpaid wages been admitted.

### b.   Lack of Guidance

Petitioner claims that trial counsel "did not guide [Petitioner] properly before, during

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

and after the trial." (Pet. at 18, Ground Four-A(2).) These broad allegations fail to raise a viable ineffective assistance of counsel claim. See Strickland, 466 U.S. at 690 (holding ineffective assistance of counsel claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.").

### c. Medical Certificate

Petitioner claims trial counsel should have objected to a "medical certificate dated in 2006," which he maintains contained fabricated expenses Fiona allegedly incurred due to Petitioner's actions. (Pet. at 18, Ground Four-A(4).) Petitioner has not attached the certificate to the Petition.

In the Answer to the Petition, Respondent surmises that Petitioner may be referring to a letter from a counselor dated July 27, 2006, which indicated that Fiona had incurred fees of $1230.00 for counseling related to the effects of Petitioner's actions. (Ex. 1 at 335.) The letter was presented at sentencing, and the court ordered restitution in that amount. (Ex. 2 at 1310:26-28.)

Petitioner offers no explanation for why he believes the letter is fabricated, or on what grounds counsel should have objected to its use at sentencing. Thus, Petitioner has failed to show that counsel's performance was deficient.

### d. Letter from Boyfriend in Samoa

Petitioner claims trial counsel was ineffective for not presenting the letter from Fiona's boyfriend in Samoa to the jury. (Pet. at 20, Ground Four-B(2).) As discussed in detail above, the letter was the source of extensive in limine arguments, and the trial court ultimately decided that allowing the contents of the letter to be presented to the jury would be more prejudicial than probative. In view of the trial court's ruling that the contents of the letter were inadmissible, Petitioner's argument that counsel should have presented the letter at trial to impeach Fiona's credibility is without merit. Further, to the extent Petitioner maintains that counsel nevertheless should have moved to admit evidence of the existence (rather than the contents) of the letter, this claim fails because Petitioner has not shown that there is a reasonable probability that the outcome of the proceeding would have been

1   different had the jury known about the existence of the letter, but not its contents.

2   **2.      Ineffective Assistance of Appellate Counsel**

3   Petitioner claims appellate counsel was ineffective for not raising "all the grounds" on
4   appeal.  (Pet. at 18, Ground Four-A(3).)

5   The Due Process Clause of the Fourteenth Amendment guarantees a criminal
6   defendant the effective assistance of counsel on his first appeal as of right.  See Evitts v.
7   Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel
8   are reviewed according to the standard set out in Strickland, i.e., counsel's advice must fall
9   below an objective standard of reasonableness, and there must be a reasonable probability
10  that, but for counsel's unprofessional errors, the defendant would have prevailed on appeal.
11  Miller v. Keeney, 882 F.2d 1428, 1433, 1434 & n.9 (9th Cir. 1989) (citing Strickland, 466
12  U.S. at 688, 694).  Appellate counsel does not have a constitutional duty to raise every
13  non-frivolous issue requested by a defendant, however.  See Jones v. Barnes, 463 U. S. 745,
14  751-54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997).  The weeding out
15  of weaker issues is widely recognized as one of the hallmarks of effective appellate
16  advocacy.  See Miller, 882 F.2d at 1434.  Appellate counsel, therefore, frequently will remain
17  above an objective standard of competence and have caused his client no prejudice for the
18  same reason – because the issue he declined to raise was weak.  See id.

19  Here, the Court has addressed Petitioner's ineffective assistance of trial counsel claims
20  and found them to be without merit; because they lack merit, their presentation to the
21  appellate court would have not resulted in a different outcome of the proceeding.

22  For the reasons discussed above, the state court's rejection of Petitioner's ineffective
23  assistance of trial and appellate counsel claims was not contrary to or an unreasonable
24  application of clearly established federal law.  Accordingly, Petitioner is not entitled to
25  habeas relief on these claims.

26  **V. CERTIFICATE OF APPEALABILITY**

27  The federal rules governing habeas cases brought by state prisoners require a district
28  court that denies a habeas petition to grant or deny a certificate of appealability in its ruling.

*United States District Court*
For the Northern District of California

24

See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. § 2254 (effective December 1, 2009).  For the reasons discussed above, Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is DENIED.

### VI. CONCLUSION

For the foregoing reasons, the Court DENIES the Petition for Writ of Habeas Corpus as to all claims.  A certificate of appealability will not be issued.  Judgment shall be entered accordingly.

DATED:  May 9, 2012

JAMES WARE
United States District Judge